1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                FOR THE EASTERN DISTRICT OF CALIFORNIA

11   KERRY HICKS,

12           Petitioner,                No. CIV S-02-1040 LKK JFM P

13        vs.

14   TOM CAREY, Warden,

15           Respondent.                FINDINGS AND RECOMMENDATIONS

16   _____/

17           Petitioner is a state prisoner proceeding through counsel with an application for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction on

19   charges of kidnaping pursuant to California Penal Code § 207.  Petitioner was also found to have

20   suffered two prior serious felonies, Cal. Penal Code § 667(b)-(i).  (Clerk's Transcript ("CT")

21   137-38.)  Petitioner was acquitted of kidnapping for purposes of robbery and of robbery.  (CT

22   217-20.).[1]  Petitioner was sentenced to 31 years to life in prison.[2]

23

24        [1] Petitioner's conviction of felony false imprisonment was reversed on appeal.

25        [2] Petitioner was sentenced to 25 years to life for kidnapping and to a determinate term of
     six years, give years for the prior serious felony conviction enhancement (§ 667(a), and one year
26   for the prior prison term enhancement (§ 667.5(b)).  (CT 270.)

1

1        In his January 13, 2003 amended petition, petitioner seeks relief on the grounds

2   that:  (1) the state courts deprived petitioner of his right to a defense by refusing to instruct the

3   jury that petitioner reasonably believed that the complaining witness consented to accompany

4   petitioner; and (2) the state court's finding that the admission of uncharged prior offenses was

5   harmless error was an unreasonable application of federal law and had a substantial and injurious

6   effect on the verdict.

7                                               FACTS[3]

8        Michael Alberti spent the night of July 20, 1998, at a motel on
    Folsom Boulevard and Highway 50 with his girlfriend and their child.
9   Between 6:00 and 7:00 a.m. the next morning, they were awakened by
    loud, persistent knocking at the door.  Alberti looked out and saw
10  [petitioner].  Alberti had known him for several years and at one time
    considered him a good friend.  Now Alberti was concerned; he thought
11  [petitioner] was there to get him because he owed [petitioner] $130 on a
    drug debt.
12
         Alberti opened the door and [petitioner] and two other men
13  came in.  Alberti sat and [petitioner] sat across from him; the two
    men stood behind [petitioner].  [Petitioner] said, "let's go for a
14  ride.  Your old lady and child don't want to see this."  Alberti
    perceived [petitioner's] statement as a command and went with
15  him.  Worried about his safety, he figured he had "an ass beating"
    coming and did not want to go.  He told his girlfriend, Kristen
16  Ferguson, to go back to bed.  She saw that Alberti was very
    nervous and trembling.  As he put on his shoes, Alberti looked at
17  the phone.

18       The men escorted Alberti to a truck and he got in.
    Although no weapons were displayed, Alberti did not feel free to
19  leave.  [Petitioner] was very focused.  As they drove to
    [petitioner's] residence, he told Alberti to call Ferguson and tell her
20  not to call the police.  At the residence, Alberti was escorted into
    the garage.  [Petitioner] sat opposite Alberti and said he was not a
21  punk and he would show Alberti what a punk is.  [Petitioner]
    thought Alberti treated him as a punk by not repaying his debt.
22  [Petitioner] knew Alberti had money because he had learned
    Alberti was looking for drugs and had a motel room.  [Petitioner]
23  told him to take off his jewelry and shoes and to empty his pockets.
    Alberti had a necklace and bracelet on and $47.
24

25       [3] The facts are taken from the opinion of the California Court of Appeal for the Third
    Appellate District in People v. Kerry Hicks, No. C033502 (March 19, 2001), a copy of which is
26  attached as Exhibit D to Respondents' Corrected Answer, filed May 16, 2003.

The men taped his hands with duct tape and then his head and mouth.  As they began to tape his legs, Alberti kicked one of the men, who kicked him back.  [Petitioner] yelled, "Stop, I don't want to leave any marks."  They taped Alberti's legs.

They discussed hanging Alberti from the rafters, but could not find any rope.  [Petitioner] was very intense.  They grabbed a wheel rim to bend Alberti over and were going to sodomize him with a cucumber.  [Petitioner's] wife came in and said the police were outside.  [Petitioner] ran to look and then cut the tape off Alberti's arms.  Alberti undid the rest of the tape, grabbed his shoes, opened the garage door and ran.  He saw the police and ran away as he had an outstanding warrant.  He ran to a supermarket and called Ferguson.

After Alberti left the motel room with [petitioner], Ferguson called the police and reported a "strong-armed" kidnapping.  She knew Alberti owed [petitioner] money.  When Alberti called her after his escape, she told him the police were looking for him, but he did not want the police involved.  After he called a second time, Ferguson told the police where he was.

When the police found Alberti, he had red wrists and he was nervous and scared.

[Petitioner] was charged with kidnapping for robbery, robbery, and false imprisonment.

Before trial the People moved to introduce evidence of prior offenses by [petitioner] to prove his intent to rob Alberti.  The defense objected.  The trial court ruled the prior incidents were admissible as they indicated an intent to use violence in collecting debts.

Susan Finnegan testified that in 1993 she lived with her son, Matthew Paisley, and his girlfriend.  One day she was home alone and heard a knock.  She looked out the peephole, but did not recognize the person so she did not open the door.  She then heard a loud bang and opened the door to ask what was going on.  [Petitioner] and Mike Esposito walked in.  She tried to stop them, but [petitioner] grabbed her and backed her into the apartment.  She then went for the phone.  [Petitioner] cut her off and pulled out the phone, disabling it.  Esposito said they wanted to talk to Paisley; while they waited, [petitioner] paced.  When Paisley returned, Finnegan yelled for someone to call 911.  Suddenly there was a knife and [petitioner] held it to Paisley's head.  Esposito held Paisley.  Finnegan hit Esposito and her son broke away.  [Petitioner] later told his probation officer they went to Paisley's house because Paisley had property belonging to Esposito's girlfriend.

3

1
2
3
4
5
6
7

Robert Silver testified that in 1995 he lent [petitioner] his Big O credit card to get his wheels aligned. [Petitioner] also got four new tires, which Silver had not agreed to. [Petitioner] called Silver and said there was not enough credit on the card so Big O was holding his truck. Silver was at work and could not talk. [Petitioner] and someone named Matt came by later; [petitioner] wanted to go for a ride and talk. [Petitioner] sat in the back seat behind Silver; [petitioner] told Silver he had disrespected him. Matt handed [petitioner] a gun. They went to three ATM's where Silver withdrew money, over $200. They then went to Big O where Silver wrote a check for $500 to release [petitioner's] truck. They drove to Matt's and Matt took Silver's $200. [Petitioner] was not present.

8
9
10

Later that month, [petitioner], Matt and another man came to visit Silver at a friend's trailer on White Rock Road to talk about the prior incident. They asked if Silver had reported the prior incident. Matt was waving a pistol. They demanded Silver's money and then gave some of it back. After they left, Silver discovered a pistol was missing from his trailer.

11
12
13

An officer testified he took Silver's statement about the two incidents. Silver did not tell the officer that [petitioner] was out of the room when Matt took the money in the first incident. Further, Silver told him that in the second incident [petitioner] returned and took his money again.

14
15
16

In defense, [petitioner's] wife testified Alberti called several times during jury selection, wanting to meet her. He wanted her to get him some drugs and would not take no for an answer. Alberti said he would not testify if she would help him. A tape of Alberti's many messages to [petitioner's] wife was played.

17
18

In rebuttal, Alberti claimed [petitioner's] wife offered him money to leave. Two of Alberti's relatives confirmed he was offered a bribe.

19

20   (People v. Kerry Hicks, slip op. at 2-6.)

21                                                      ANALYSIS

22   I. Standards for a Writ of Habeas Corpus

23         Federal habeas corpus relief is not available for any claim decided on the merits in

24   state court proceedings unless the state court's adjudication of the claim:

25                 (1) resulted in a decision that was contrary to, or involved an
                   unreasonable application of, clearly established Federal law, as
26                 determined by the Supreme Court of the United States; or

1           (2) resulted in a decision that was based on an unreasonable
2           determination of the facts in light of the evidence presented in the
              State court proceeding.

3  28 U.S.C. § 2254(d).

4          Under section 2254(d)(1), a state court decision is "contrary to" clearly

5  established United States Supreme Court precedents if it applies a rule that contradicts the

6  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

7  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

8  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

9  (2000)).

10         Under the  "unreasonable application" clause of section 2254(d)(1), a federal

11  habeas court may grant the writ if the state court identifies the correct governing legal principle

12  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

13  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

14  simply because that court concludes in its independent judgment that the relevant state-court

15  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

16  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,

17  123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

18  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

19         The court looks to the last reasoned state court decision as the basis for the state

20  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

21  II.  Petitioner's Claims

22     A. Claim One

23         Petitioner's first claim is that the state courts deprived petitioner of his defense, in

24  violation of the due process clause, by refusing to instruct the jury that petitioner reasonably

25  believed that the complaining witness consented to accompany petitioner, sometimes referred to

26  /////

1   as the <u>Mayberry</u> defense.[4]  Petitioner contends the trial court should have sua sponte instructed

2   the jury with CALJIC No. 9.58, the <u>Mayberry</u> defense instruction.[5]

3          The California Supreme Court denied petitioner's petition for review on June 11,

4   2001, without comment.  The last reasoned rejection of this claim is the decision of the

5   California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The

6   state court rejected this claim as follows:

7          "The *Mayberry* defense has two components, one
       subjective, and one objective.  The subjective component asks
8      whether the defendant honestly and in good faith, albeit
       mistakenly, believed the victim consented to [accompany him].  In
9      order to satisfy this component, a defendant must adduce evidence
       of the victim's equivocal conduct on the basis of which he
10     erroneously believed that there was consent." (*People v. Williams*
       (1992) 4 Cal.4th 354, 360-361, fn. omitted.)  The objective
11     component asks whether the defendant's mistake as to consent was
       reasonable under the circumstances.  (*Id.* at p. 361.)

12
          A *Mayberry* instruction need not be given in every case in
13     which consent is a defense.  (*People v. Williams, supra,* 4 Cal.4th
       at p. 362, fn. 7.)  "[A] trial court need only give a *Mayberry*
14     instruction on its own motion where 'it appears that a defendant is
       relying on such a defense, or if there is substantial evidence
15     supportive of such a defense and the defense is not inconsistent
       with the defendant's theory of the case.' [Citation.]" (*People v.*
16     *Romero* (1985) 171 Cal.App.3d 1149, 1156.)

17         The defense asserted this case was no more than a glorified
       disturbance of the peace.  Defense counsel argued Alberti
18     consented to go with [petitioner].  He further argued Alberti could
       have signaled to [petitioner] that he did not want to go "so that at
19     least he'd give Mr. Hicks the small courtesy of knowing that he

20  _____

21     [4]  <u>People v. Mayberry</u>, 15 Cal.3d 143, 155 (1975)(reversed convictions of rape and
   kidnapping due to the trial court's refusal to instruct the jury it must acquit the defendant if it had
22  a reasonable doubt as to whether the defendant reasonably and genuinely believed that the victim
   consented to her being taken to the defendant's apartment and to sexual intercourse with the
   defendant).
23
       [5]  "It is a defense to the crime of kidnapping that a defendant lacked general criminal
24  intent.  There is no general criminal intent if a defendant entertained a reasonable and good faith
   believe that the person alleged to have been kidnapped voluntarily consented to accompany the
25  defendant and to the movement involved in the purported kidnapping.  If from all the evidence
   you have a reasonable doubt that the defendant had general criminal intent at or during the time
26  of the movement, you must find [him] [her] guilty of kidnapping." CALJIC No. 9.58.

1    was committing a kidnapping." Thus, while the defense was actual
     consent, a defense of mistaken belief in consent was not
2    inconsistent. Accordingly, we look to whether there was
     substantial evidence to support a *Mayberry* defense.
3
         While Alberti's conduct could be considered equivocal in
4    that he did not struggle, cry out or otherwise resist, a belief that he
     consented to leave with [petitioner] was not reasonable under the
5    circumstances. [Petitioner] showed up at Alberti's motel early in
     the morning, accompanied by two henchmen. The visit was not
6    friendly; [petitioner] was intense and focused. Alberti thought
     [petitioner] was there to get him for the drug debt. He told his
7    girlfriend to go back to bed, but he was trembling and looking at
     the phone before he left, which prompted her to call the police and
8    report the kidnapping. Finally, [petitioner] told Alberti to call
     Ferguson and tell her not to call the police, hardly the command of
9    a man who honestly believes his companion is accompanying him
     voluntarily.

10

11   (People v. Hicks, slip op. at 9-10.)

12        In general, a challenge to jury instructions does not state a federal constitutional

13   claim. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

14   U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). In order to

15   warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable,

16   erroneous, or even "universally condemned,"' but must violate some due process right

17   guaranteed by the fourteenth amendment." Prantil v. California, 843 F.2d 314, 317 (9th Cir.

18   1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)). To prevail on such a claim

19   petitioner must demonstrate that the "ailing instruction . . . so infected the entire trial that the

20   resulting conviction violates due process.'" Middleton v. McNeil, 541 U.S. 433, 437 (2004)

21   (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)). In making its determination, this court

22   must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as

23   a component of the entire trial process.'" Prantil, 843 F. 2d at 317 (quoting Bashor v. Risley, 730

24   F.2d 1228, 1239 (9th Cir. 1984)). See also Middleton, 541 U.S. at 437. Where, as here, the

25   challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially

26   heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than

7

1   a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). See also Villafuerte

2   v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).  A habeas petitioner is not entitled to relief for

3   failure to instruct unless the record demonstrates that the trial error had a "substantial and

4   injurious effort or influence in determining the jury's verdict." (Brecht v. Abrahamson, 507 U.S.

5   619, 633 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946).)

6           Here, petitioner argues that the trial court usurped the role of the jury by not

7   providing the jury with the defense theory, that is, "that despite evidence that the complaining

8   witness was compelled, petitioner could reasonably believe that the complaining witness

9   consented." (Traverse at 2.)  Petitioner argues that the Ninth Circuit Court of Appeal has found

10  that weighing the evidence for and against the proposed instruction was an unreasonable

11  application of established federal law. Bradley v. Duncan, 315 F.3d 1091 (9th Cir. 2002)(where

12  a trial court had determined that an entrapment instruction was required in a trial that ended in a

13  mistrial, the instruction was also required to be given in the subsequent retrial where "no

14  additional evidence to the contrary" rebutted the prior ruling.).

15          The Bradley court noted that the Supreme Court has held that "[a]s a general

16  proposition, a defendant is entitled to an instruction as to any recognized defense for which there

17  exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States,

18  485 U.S. 58, 63 (1988)(citation omitted)(on direct appeal of a conviction for accepting a bribe,

19  conviction reversed because the trial judge refused to instruct the jury on a defense which was

20  both supported by the evidence and requested by the defense).  The Court of Appeals for the

21  Ninth Circuit has applied this standard to habeas petitions arising from state convictions. See

22  Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 1999)(habeas petition granted where trial court

23  refused to instruct the jury on a lesser included offense even though the defendant properly

24  requested the instruction and the prosecution agreed it was appropriate).[6]  However, the circuit

25

26          [6] The Ninth Circuit recently held, in a direct appeal of a federal criminal conviction for
    conspiracy to transport illegal aliens and transportation of illegal aliens, that "[a] defendant is

8

1   did not eliminate the underlying requirement that there be evidentiary support for the requested

2   instruction.  Id.[7]

3              Bradley is distinguishable on its facts.  In Bradley, there was ample evidence to

4   support the defense theory of entrapment yet the jury received no instruction on how to apply the

5   entrapment evidence they heard should they find in defendant's favor.  Here, the jury was

6   instructed on consent and were instructed that if the prosecution had not proved each element of

7   the crime, the jury must acquit.  In addition, the Bradley court was bound by a prior court ruling

8   granting the use of the entrapment instruction and there was no justification for the second trial

9   court's refusal to use it after the first trial ended in mistrial.

10             In the instant case, the objective prong under Mayberry is dispositive.  Even

11  assuming that there was substantial evidence of equivocal conduct from which petitioner could

12  have honestly, but mistakenly, concluded that the victim consented to go with him (which there

13  was not, as discussed below), any such belief, given the intimidation, the presence of

14  "henchmen," the difference in physical sizes between the victim and the two men who

15  accompanied petitioner, and the drug debt-collection context, was not reasonable or one which

16  society would tolerate as reasonable.  See People v. Williams, 4 Cal.4th 354, 361, 14 Cal.Rptr.2d

17  441 (1992) (regardless of how strongly defendant may believe in consent, "that belief must be

18  formed under circumstances society will tolerate as reasonable . . . for the defendant to have

19

20  entitled to instructions relating to a defense theory for which there is any foundation in the
    evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful
21  credibility.  United States v. Wofford, 122 F.3d 787, 789 (9th Cir.1997), as amended (Aug. 21,
    1997).  A mere scintilla of evidence supporting a defendant's theory, however, is not sufficient to
22  warrant a defense instruction.  Id.") But habeas review for purposes of determining whether
    petitioner sustained a constitutional violation differs from the circuit's supervisory role over
23  direct appeals from federal district courts.  See Duckett v. Godinez, 67 F.3d 734 (9th Cir.
    1995)("we may require the district courts to 'follow procedures deemed desirable from the
24  viewpoint of sound judicial practice although in no wise commanded . . . by the Constitution.'"
    Cupp v. Naughten, 414 U.S. 141, 146 . . . (1973)."  Duckett, 67 F.3d at 744.
25
        [7]  It also appears Conde was decided under the less deferential standards which applied
26  before AEDPA.

1  adduced substantial evidence giving rise to a *Mayberry* instruction.").  Given the facts of this

2  case, the state appellate court's holding was not unreasonable.

3      Alternatively, there also was not substantial evidence of equivocal conduct by the

4  victim that would require giving the instruction.  This is a closer question than on the objective

5  prong.  Petitioner points to evidence that the victim was not physically forced to leave and did

6  not object when petitioner asked the victim to leave with him.  However, these events need to be

7  considered in context, which is set out in the court of appeal opinion above.  The victim had been

8  warned he should leave to spare his girlfriend and child, and was nervous he was about to be

9  beaten over an unpaid drug debt.  While petitioner was intense and focused in the victim's

10  presence, he was also accompanied by two henchmen who stood behind petitioner, all facing the

11  victim.  The victim's girlfriend testified that one of the men was 6 foot tall and weighed about

12  220 pounds and the other was 6 foot tall and had a heavy build.  (RT at 103).  The victim

13  testified he was 5'5" tall and weighed 145 pounds.  (RT at 42.)  In this context, the evidence to

14  which petitioner points is not substantial.

15      Moreover, even if there was equivocal conduct that might have supported the

16  instruction, the failure to give the instruction was harmless because other instructions cured any

17  deficiency.  Cf. United States v. Duran, 59 F.3d 938, 941-42 (9th Cir. 1995)(denial of defense

18  theory instruction is not error where the instructions given adequately encompass the defense

19  theory); Duckett v. Godinez, 67 F.3d 734, 743-46 (9th Cir. 1995)(habeas petition denied even

20  though alibi instruction was omitted because the reasonable doubt instruction expressly required

21  the jury to find defendant committed the crime).

22      In the instant case, the jury was instructed on the elements of consent, including

23  the fact that "being passive does not amount to consent.  Consent requires a free will and positive

24  cooperation in act or attitude." (CT at 186.)  The jury was also instructed as to the elements of

25  the lesser-offense of kidnapping, Cal. Penal Code § 207(a), including the element that the victim

26  was "unlawfully moved by the use of physical force, or by any other means of instilling fear,"

1   and that the movement was without the victim's consent.  (CT at 188.)  The jury was instructed

2   to consider the instructions as a whole and each instruction in light of all the others.  (Reporter's

3   Transcript ("RT") at 352.)  The jury was expressly instructed that petitioner was presumed

4   innocent until the contrary was proven and that it was the prosecution's burden to prove

5   petitioner was guilty beyond a reasonable doubt.  (RT at 364.)  The jurors were properly

6   instructed as to the definition of "reasonable doubt."  (RT at 364.)

7          The jury found that petitioner did not have the specific intent to rob the victim

8   because it found petitioner not guilty of kidnapping with intent to commit robbery.  (CT 217.)

9   However, if the jury had believed that the victim consented to accompany petitioner, it could not

10  have found petitioner guilty of kidnapping.  The jury had to find that petitioner unlawfully moved

11  the victim by other means of instilling fear in order to find petitioner guilty of kidnaping.

12         Thus, the state court's rejection of petitioner's first claim for relief was neither

13  contrary to, nor an unreasonable application of, controlling principles of United States Supreme

14  Court precedent.  Petitioner's first claim for relief should be denied.

15      B.  Second Claim

16         Petitioner's second claim is that the state appellate court's holding that the

17  admission of uncharged prior offenses was harmless error was an unreasonable application of

18  federal constitutional law and had a substantial and injurious effect on the verdict.

19         The California Supreme Court denied petitioner's petition for review on June 11,

20  2001, without comment.  The last reasoned rejection of this claim is the decision of the

21  California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The

22  state court rejected this claim as follows:

23          The first incident was [petitioner's] assault on Matthew
            Paisley, as recounted by Paisley's mother.  [Petitioner] contends it
24          was error to admit this evidence because it does not show an intent
            to rob.  We agree.
25
            The Attorney General asserts [petitioner] has waived this
26          contention by failing to object below.  [Petitioner], however, not

11

1  only generally objected to the evidence coming in under Evidence Code section 1101, subdivision (b), but also specifically objected

2  to Susan Finnegan's testimony on relevancy grounds.

3  The Attorney General next contends the evidence was admissible because it was similar to the charged offense. The

4  intent to rob in the Paisley incident was shown by [petitioner's] statement that he and Esposito went to Paisley's because Paisley

5  had property belonging to Esposito's girlfriend. While this statement may show the motive for the attack, it does not show an

6  intent to rob. There was no evidence [petitioner] robbed or attempted to rob Paisley. In admitting the evidence, the trial court

7  focused on the element of force. Robbery, however, also requires a taking and there was no evidence of a taking in the Paisley

8  incident. Since this incident was irrelevant to the proffered purpose of intent, it was error to admit it.

9

10  The second uncharged offense was when Silver loaned [petitioner] his Big O credit card and [petitioner] charged more than the credit limit, causing his truck to be held as security.

11  [Petitioner] and Matt then picked up Silver. [Petitioner] told Silver he had "disrespected" [petitioner] and [petitioner] assaulted Silver

12  with a gun. They drove Silver to several ATM's so he could withdraw money, made him pay all the charges on the credit card

13  to release the truck, and then stole his money.

14  [Petitioner] contends this incident does not show an intent to rob, as Silver testified Matt took his money while [petitioner]

15  was absent. [Petitioner] further contends the robbery of Silver was an afterthought, so it had no probative value on the issue of

16  whether he kidnapped Alberti for purposes of robbery. [Petitioner] asserts this incident, involving a garageman's lien instead of a drug

17  debt, is too dissimilar to the charged offense to prove a common intent.

18

19  The jury could infer an intent to rob from the Big O incident. First, the prior offense need only be proved by a preponderance of the evidence. (People v. Carpenter (1997) 15

20  Cal.4th 312, 382.) The jury could have inferred that [petitioner] knew of the robbery, even if absent, because, after pulling a gun on

21  Silver, he had directed Silver to withdraw money from several ATM's. Further [petitioner] forced Silver to write a check to cover

22  the expenses [petitioner] ran up on the credit card, including the tires that Silver had not agreed to pay for. Even if this act was

23  technically extortion rather than robbery, it still shows an intent to deprive Silver of his property by force. Because this evidence

24  supports an inference of an intent to rob, there is no merit to [petitioner's] contention that the instruction permitting such an

25  inference (CALJIC No. 2.50) violates due process.

26  /////

12

1          This incident was strikingly similar to the charged offense;
   the trial court found the facts "frighteningly close."  In each case,
2  [petitioner] felt he had been treated badly; "disrespected" by Silver
   and treated like a punk by Alberti.  In each he responded by
3  tracking down the offender with one or more cohorts, abducting
   him, and forcibly taking what [petitioner] felt was his due.
4
          The third incident was the related confrontation on White
5  Rock Road.  [Petitioner], Matt, and another came to talk to Silver
   about whether he reported the Big O incident.  Matt had a gun;
6  they robbed Silver of money and a pistol was taken.  While this
   incident is not as probative as the Big O incident, it does who that
7  [petitioner] forms an intent to rob as a reaction to perceived
   "disrespect."
8
          [Petitioner] contends both the Big O and White Rock Road
9  incidents should have been excluded under Evidence Code section
   352 as more prejudicial then probative.  [Petitioner] contends this
10 evidence was inflammatory as it involved guns; it was confusing
   and time consuming, especially as the jury got sidetracked into
11 issues involving the theft of the pistol and the prosecution had to
   call an officer to impeach some of Silver's testimony; the probative
12 value of the evidence on the issue of intent was slight; and the
   incidents were remote, having occurred three years earlier.
13
          While the trial court noted its analysis under section 352,
14 the record is not clear that [petitioner] moved to exclude the
   evidence on this basis.  (Evid. Code, § 353.)  In any event, at least
15 the evidence of the Big O incident was admissible over a section
   352 objection.  Its probative value, as explained above, was greater
16 than [petitioner] allows.  The evidence was not so remote or time
   consuming as to require exclusion.  And the prejudicial effect of
17 the evidence was lessened by the jury's learning that [petitioner]
   had been convicted.  (*People v. Ewoldt, supra,* 7 Cal.4th at pp.
18 402-404.)

19         Finally, [petitioner] contends this prior offense evidence
   served primarily to show he was a thug, improper character
20 evidence.  He claims the result was his conviction for kidnapping,
   despite the absence of evidence of force and Alberti's glaring
21 weaknesses as a witness.  While we have concerns that the
   evidence of [petitioner's] prior offenses, particularly the Paisley
22 assault and the White Rock Road incident, presented improper
   character evidence, we find any error in admitting this evidence
23 was harmless.  Significantly, the jury apparently placed little
   weight on this evidence, acquitting [petitioner] of kidnapping for
24 robbery and robbery.  The conviction for kidnapping was amply

25 /////

26 /////

13

1      supported by the testimony of Alberti's abduction and the evidence
       of his condition afterwards.
2

3    (People v. Hicks, slip op. at 13-16.)

4           The United States Supreme Court "has never expressly held that it violates due

5    process to admit other crimes evidence for the purpose of showing conduct in conformity

6    therewith, or that it violates due process to admit other crimes evidence for other purposes

7    without an instruction limiting the jury's consideration of the evidence to such purposes."

8    Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), overruled on other grounds by

9    Woodford v. Garceau, 538 U.S. 202 (2003).  In fact, the Supreme Court has expressly left open

10   this question.  See Estelle v. McGuire, 502 U.S. at 75 n.5 ("Because we need not reach the issue,

11   we express no opinion on whether a state law would violate the Due Process Clause if it

12   permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

13   Accordingly, the state court's decision with respect to this claim was not contrary to United

14   States Supreme Court precedent.

15          Further, any error in admitting this evidence did not have "a substantial and

16   injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S.

17   619, 637 (1993).  See also Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990)(admission of

18   prior acts of misconduct to prove intent did not violate due process).  As described above, there

19   was direct evidence against petitioner, consisting of the victim's testimony and the testimony of

20   his girlfriend, Kristin Ferguson.  (RT 42-109; 100-18.)  Two law enforcement officers testified

21   that the victim's wrists were red and pink and missing hair, and that used duct tape was found at

22   the crime scene.  (RT 140; 142; 144; 169.)

23          Any threat of improper prejudice flowing from the testimony was  mitigated by

24   the trial court's instructions directing the jury to consider the uncharged acts testimony only as it

25   was relevant to show the existence of intent and not to show that petitioner was a person of bad

26   character or that he had a disposition to commit crimes.  The trial judge admonished the jury

14

1   immediately prior to the testimony concerning each prior act.  (RT 120-21; 179-80.)  In addition,

2   the jury was instructed that these prior acts were admitted for a limited purpose, the existence of

3   intent.  (356-57; 360-61.)  The jury is presumed to have followed these instructions.  Old Chief v.

4   United States, 519 U.S. 172, 196-97 (1997); United States v. Reed, 147 F.3d 1178, 1180 (9th

5   Cir. 1998).

6          Moreover, it is apparent the jury followed these limiting instructions because they

7   found petitioner not guilty of kidnaping for purpose of robbery and robbery, obviously finding

8   that petitioner did not have the requisite intent.  Because simple felony kidnaping is a general

9   intent crime, the jury was not required to find petitioner had the specific intent to commit

10  kidnaping, for which petitioner was ultimately convicted.  In addition, the jury had the

11  opportunity to weigh the credibility of all persons proffering evidence.  Finally, the testimony

12  concerning these prior acts did not unduly usurp the trial of the underlying offenses herein.

13  Three witnesses testified concerning these prior acts and out of 267 pages of total testimony, only

14  52 were devoted to the prior uncharged acts.  (RT at 118-36 (Paisley); 179-204 (Big O); 205-14

15  (Big O).)

16         Accordingly, for all of these reasons, petitioner is not entitled to relief on this

17  claim.

18         For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's

19  application for a writ of habeas corpus be denied.

20         These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

22  after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  shall be served and filed within ten days after service of the objections.  The parties are advised

26  /////

1   that failure to file objections within the specified time may waive the right to appeal the District

2   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   DATED:  January 10, 2006.

4

5                                                          _____

6                                                          UNITED STATES MAGISTRATE JUDGE

7

8   /001;hick1040.157

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26